EL PUEBLO DE PUERTO RICO, demandante y recurrido, *v.* ARCADIO TORO GOYCO, acusado y recurrente.

*Número:* 17 *Resuelto:* 9 de febrero de 1962

---

[9] 344 U.S. 174; 97 L. ed. 200 (1952).

*José Rafael Gelpí,* abogado del recurrente; *J. B. Fernández Badillo, Procurador General* y *Carlos G. Latimer, Procurador General Auxiliar,* abogados de El Pueblo; *Santos P. Amadeo,* como *amicus curiae.*

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

En *Pueblo* v. *Quiles,* 83 D.P.R. 63 (1961) y *Pueblo* v. *Pacheco,* 83 D.P.R. 285 (1961) consideramos planteamientos similares a los que informa el caso de autos. Sostuvimos que el hecho de que el juez que preside la vista de un caso criminal hubiera conocido del mismo antes del juicio, por haber leído unas declaraciones juradas u oído declarar a unos testigos que el fiscal examinaba, para entonces determinar si existía causa probable para el arresto, no lo incapacitaba para resolver el caso en su fondo. En éste la cuestión a resolver es si un juez que investiga personalmente el caso, y una vez practicada la investigación ordena que se radique la denuncia, es el juez imparcial que para la vista del caso le garantiza a todo acusado el debido proceso de ley.

El recurrente, luego de investigados los hechos que se le imputaron, fue acusado por el juez de Distrito, Sala de Cabo Rojo, por los delitos de alterar la paz y violación de la Ley de Automóviles, consistente en obstruir el libre tránsito de los vehículos en una vía pública. El juez que investigó y ordenó la radicación de las denuncias presidió la vista de los casos. Lo declaró culpable en ambos y le impuso, en el de alterar la paz $60 de multa o dos meses de cárcel y en el de violación a la Ley de Automóviles lo condenó a pagar $15 de multa o quince días de cárcel. Recurrió ante el Tribunal Superior, Sala de Mayagüez y se confirmaron ambas sentencias. Expedimos el certiorari que solicitó para revisarlas. Plantea la cuestión que antes apuntamos.

Siguiendo la pauta que establecimos en *In re Marín Báez,* 81 D.P.R. 274 (1959) y que ratificamos en *Quiles* y *Pacheco* procede que consideremos la índole del procedimiento seguido en el caso de autos, para entonces determinar el grado de relación que tuvo el juez con la prueba y los probables efectos de esa relación sobre su desinterés e imparcialidad.

De acuerdo con las disposiciones del art. 24 del Código de Enjuiciamiento Criminal, (34 L.P.R.A. sec. 55) cuando el juez que investiga "se convenciere de que la denuncia entraña un delito, practicará una breve investigación testifical, para averiguar la persona o personas que *hubieren cometido el delito.* Si no apareciere ningún culpable archivará el proceso. Pero si apareciere algún *culpable,* señalará el día más próximo posible para celebrar el juicio correspondiente, citando al denunciante y a los testigos de cargo y al acusado, haciendo saber a este último el delito denunciado, y los detalles necesarios en cuanto a fecha, sitio, persona y propiedad, de modo que el acusado pueda fácilmente comprender la naturaleza y circunstancias del delito cometido. . ." (Enfasis nuestro.)

En el caso de autos se siguió el procedimiento establecido en el art. 24 arriba transcrito. El juez que sentenció al

recurrente en el Tribunal de Distrito investigó la querella, determinó que se había cometido un delito y que el acusado era el presunto "culpable" y ordenó que se radicaran las denuncias correspondientes. Entonces ese mismo juez presidió la vista de los casos y condenó al acusado. ▮

Ingrediente fundamental de un juicio justo es que lo presida un juez imparcial. *In re Murchison*, 349 U.S. 133 (1955) ; *Tumey* v. *Ohio*, 273 U.S. 510 (1927) ; *State* v. *Leland*, 227 P.2d 785 (Or. 1951) ; Confir. *Leland* v. *Oregon*, 343 U.S. 790 (1952). Que la imparcialidad del juez es esencial se estableció hace más de seiscientos años en Inglaterra. En el 1352 se terminó con la práctica de que podían participar en el jurado aquellas personas que habían formado parte del Gran Jurado que había determinado que existía causa probable contra el acusado. Imbau, *The Concept of "Fair Hearing" in Anglo-American Law*, 31 Tul. L. Rev. 67, 70 (1956). Ya en el siglo *XIV* en Inglaterra la persona que investigaba no podía juzgar para determinar la inocencia o culpabilidad del acusado. En nuestro cuerpo de leyes tenemos una medida similar. En aquellos casos donde interviene el Gran Jurado, sus miembros no pueden formar parte del "pequeño" jurado, Ley Núm. 58 de 18 de junio de 1919; 34 L.P.R.A. sec. 575, y si participaren como integrantes del jurado que juzga, el veredicto es nulo y se revocará la sentencia, *Pueblo* v. *Martínez*, 31 D.P.R. 620 (1923). Y fue más allá el legislador al disponer que los miembros del jurado que condenaba no pueden participar si se concediera un nuevo juicio, 34 L.P.R.A. sec. 681. Vemos pues que el legislador puertorriqueño ha querido en todo momento garantizar que el juzgador de los hechos, sea completamente imparcial. Que no exista duda en el acusado de que aquél que tiene poder para privarlo de su libertad está en alguna forma influido por otra cosa que no sea la prueba que desfila el día del juicio.

En el presente no estamos ante la situación que afrontamos en *Quiles* y donde expresamos:

"En el caso de autos el juez a quo no examinó testigo alguno. Su participación consistió en examinar una declaración jurada para determinar si había causa probable para expedir una orden de allanamiento y posteriormente otra declaración para determinar si había causa probable para el arresto. Como no examinó testigo alguno, no hubo posibilidad de que en su mente quedara grabado nada de lo que pueda impresionar a un juez cuando oye y ve declarar a una persona. Su intervención preliminar en el procedimiento se concretó a la actuación esencialmente pasiva del juzgador que, en forma enteramente impersonal, examina unos documentos a los fines de determinar si los mismos son de suficiente peso para justificar que se decrete el arresto. No fue la suya la conducta activa y llena de celo del acusador que investido de la función de traer al delincuente ante el foro de la justicia, se da de lleno, con la fogosidad y dinamismo que su ministerio público exigen, a la tarea de reunir la evidencia necesaria para sostener la acusación que ha de radicar. . ."

Aquí estamos ante un caso en que el juez que presidió la vista y condenó al acusado examinó los testigos y determinó según lo establece el art. 24 del Código de Enjuiciamiento Criminal, que se había cometido un delito. Existe la posibilidad de que en su mente quedaran grabadas las impresiones que pudieran influir en la apreciación que hizo de la prueba el día que se ventiló el caso. Su intervención fue más activa, pues la hizo con miras a reunir la evidencia necesaria para sostener la conclusión a que llegó de que el acusado era culpable. ■

En esta situación parece clara la aplicabilidad de *In re Murchison*, supra, donde se estableció que se viola el debido proceso de ley cuando se celebra el juicio en su fondo ante el mismo juzgador que previamente tomó parte activa en la investigación de los hechos del caso. Se dijo en *Murchison:*

"Un juicio justo en un tribunal imparcial es requisito básico del debido proceso de ley. La justicia desde luego exige la ausencia de un verdadero prejuicio al juzgar los casos. Pero nuestro sistema de derecho ha tratado siempre de evitar hasta la probabilidad de la injusticia. Con este propósito ninguna persona puede ser juez en su propio caso y no se le permite a

nadie juzgar casos en cuyo resultado tenga interés. Tal interés no puede definirse con precisión. Deben considerarse las circunstancias y las relaciones. Este Tribunal ha expresado, sin embargo, que 'todo procedimiento que pudiera servir de posible tentación a un hombre promedio como juez. . . a no mantener un balance preciso, claro y verdadero entre el Estado y el acusado, le niega a éste el debido proceso de ley.' (citas) Una regla tan estricta puede en ocasiones impedir que actúen jueces que no están en verdad prejuiciados y quienes harían todo lo posible por mantener la balanza de la justicia en su fiel entre las partes litigantes. Pero para desempeñar su alta función de la manera más correcta 'la justicia debe satisfacer las apariencias de la justicia.' (citas)

Sería muy raro que nuestro sistema de derecho le permitiera a un juez que actuara como gran jurado y que luego juzgara a las mismas personas que han sido acusadas como resultado de sus investigaciones. Quizás ningún Estado haya jamás obligado a un acusado a aceptar los miembros de un gran jurado como jurados adecuados en relación con acusaciones surgidas de sus investigaciones. Un solo 'juez-gran jurado' es más parte del proceso acusatorio que una persona lega, corriente, miembro de un gran jurado. Habiendo formado parte de ese proceso un juez no puede estar, de acuerdo con la propia naturaleza de las cosas, completamente desinteresado en cuanto a la convicción o absolución de los acusados. Si bien es verdad que no es probable que tenga todo el celo de un fiscal, no puede ciertamente decirse que carecería totalmente de dicho celo. Los juicios imparciales son una parte demasiado importante de nuestra sociedad libre para permitir que jueces-fiscales sean jueces-sentenciadores en relación con las acusaciones que ellos mismos radican..."

Véase Notas: *Disqualification of Judges For Bias*, 44 Calif. L. Rev. 425 (1956); 69 Harv. L. Rev. 162 (1955). ■

En *Marín Báez* distinguimos a *Murchison*, de la situación de hechos que éste presentaba. Al distinguirlo, afirmamos que entre los hechos y circunstancias que lo diferenciaban se encontraba la de que los jueces de este Tribunal, en el caso de *Marín Báez*, nunca se relacionaron con los testigos ni en

manera alguna intervinieron en la investigación y que la querella la prepararon los fiscales y éstos la sostuvieron ante el Tribunal utilizando las pruebas y métodos que consideraron convenientes. Lo dicho en *Marín Báez* lo aplicamos a *Quiles y Pacheco*. Pero en el presente caso, como hemos visto, el juez se relacionó directamente con los testigos, intervino en la investigación, y ordenó la radicación de la denuncia según lo dispone el art. 24 del Código de Enjuiciamiento Criminal antes citado, y en el día del juicio, por no contar con fiscales el Tribunal de Distrito, aunque no actuó como tal, fue el propio juez el que dirigió la presentación de la prueba. Este caso cae, por tanto, dentro de lo proscrito en *Murchison*.

El Código de Enjuiciamiento Criminal Español vigente en Puerto Rico durante la dominación española, en su art. 54 disponía que el juez que investigaba era susceptible de ser recusado y en el 55 le hacía mandatorio inhibirse. ¿Cómo se explica entonces que nuestro legislador a principios de siglo, con la tradición española a corta distancia en su experiencia, de que el juez que investigaba no debía conocer del caso, aprobara la disposición que encarna el art. 24 antes referido? Nos parece que la explicación es clara. El *amicus curiae* la señala. En el propio Código se establecía el remedio. Se concedía un juicio *de novo*, como cuestión de derecho ante un tribunal superior donde el caso empezaría de nuevo tal y como si se viese en primera instancia. En ese sentido el efecto práctico del proceso ante el primer tribunal podría equipararse al de una vista preliminar. El derecho a un juicio *de novo* curaba las deficiencias constitucionales del juicio ante el tribunal sentenciador. *Application of Borchert*, 359 P.2d 789 (Wash. 1961); *State* v. *González*, 95 P.2d 673 (N. M. 1939); *Hill* v. *State*, 298 S.W. 321 (Ark.1927). Con esto el derecho del acusado a un juicio justo presidido por un juez imparcial estaba en principio garantizado. El derecho al juicio *de novo* era la garantía. Ahora, con la aprobación de la Ley de la Judicatura en el año 1952, desapareció

el derecho a un juicio *de novo* (4 L.P.R.A. sec. 122). Desapareció con ello la garantía, para el acusado en el Tribunal de Distrito, en aquellos casos donde el juez que presidía la vista era el que había investigado, de que en última instancia su juicio lo presidiría un juez de cuya imparcialidad no podía dudarse.

El juez que investiga no debe ser el juez que juzga. Ya para el 1882, en el Real Decreto de 14 de septiembre de ese año, en la Exposición de la Ley de Enjuiciamiento Criminal Española al comentar sobre las disposiciones de los artículos 54 y 55 a que antes aludimos se dijo:

"Con ser estos dos vicios tan capitales [dilación en instaurar el proceso y temor constante de que se reinstalara] no son sin embargo los únicos, ni acaso los más graves de nuestro procedimiento. Lo peor de todo es . . . que el juez que instruye éste es el mismo que pronuncia la sentencia con todas las preocupaciones y prejuicios que ha hecho nacer en su ánimo la instrucción." ■

Procede reiterar aquí lo que dijimos en *Reyes* v. *Tribunal Superior*, 84 D.P.R. 29 (1961):

"No por haberse expresado en innumerables ocasiones debe dejarse de repetir, que uno de los derechos más preciados que tiene el ciudadano en nuestra comunidad es que cuando se le acuse de delito se le juzgue en tales circunstancias que el proceso que se le celebre esté rodeado de todas las garantías que hacen posible un juicio justo."

Base fundamental del juicio justo es la imparcialidad del juez. Y esa imparcialidad es la que origina la confianza en la justicia por parte de la ciudadanía; y es en esa confianza que se basa el respeto que la ciudadanía tiene en los jueces. Es obligación de los tribunales velar porque esa confianza nunca desaparezca.

Aquí, vale repetir unas palabras del Juez Vanderbilt que aparecen en su obra *The Challenge of Law Reform* (Princeton 1955) a las páginas 4 y 5:

"Es en los tribunales y no en la legislatura que nuestros ciudadanos fundamentalmente sienten el fino y tajante filo de la ley.  Si la ciudadanía respeta a los tribunales, su respeto por la ley ha de perdurar no importa las imperfecciones de todas las demás ramas del gobierno; pero si pierde su respeto a los tribunales, su respeto por la ley y el orden han de desaparecer en grave perjuicio de la sociedad, pues ciertamente no puede ser objeto de discusión que el respeto a la ley es la condición más importante para la supervivencia de un gobierno al servicio del pueblo."

*Se revocará la sentencia recurrida y se devolverá el caso para un nuevo juicio.*

El Juez Asociado Sr. Rigau disintió.